JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division
GUSTAV W. EYLER
Director
Consumer Protection Branch
SHANNON L. PEDERSEN
Trial Attorney
Ore. State Bar No. 102073
Consumer Protection Branch
Department of Justice, Civil Division
P.O. Box 386
Washington, D.C. 20044
(202) 532-4490

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AMARC ENTERPRISES, INC., a corporation; and ALBERT LEE SANCHEZ, JR. and GARY L. MATSON, SR., individuals,<br><br>Defendants. | Case No.: **'20 CV2351 MMA AGS**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION** |

Plaintiff, the United States of America, by its undersigned attorneys, and on behalf of the United States Food and Drug Administration ("FDA"), respectfully represents to this Court as follows:

1. This statutory injunction proceeding is brought under the Federal Food, Drug, and Cosmetic Act (the "Act"), 21 U.S.C. § 332(a), and this Court's inherent equitable authority, to permanently enjoin and restrain Defendants AMARC Enterprises, Inc., a corporation, and Albert Lee Sanchez, Jr. and Gary L. Matson, Sr., individuals (collectively, "Defendants"), from violating:

1

      A.    21 U.S.C. § 331(d) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce, new drugs within the meaning of 21 U.S.C. § 321(p) that are neither approved pursuant to 21 U.S.C. § 355(a), (b), or (j), nor exempt from approval pursuant to 21 U.S.C. § 355(i);

      B.    21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce, drugs, as defined by 21 U.S.C. § 321(g)(1), that are misbranded within the meaning of 21 U.S.C. § 352(f)(1) because their labeling fails to bear adequate directions for use;

      C.    21 U.S.C. § 331(k) by causing a drug to become misbranded within the meaning of 21 U.S.C. § 352(f)(1), while such drug is held for sale after shipment in interstate commerce;

      D.    21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce, a new animal drug, as defined by 21 U.S.C. § 321(v), that is adulterated within the meaning of 21 U.S.C. § 351(a)(5) because it is unsafe in that it is not the subject of any FDA approval pursuant to 21 U.S.C. § 360b, conditional approval pursuant to 21 U.S.C. § 360ccc, or relevant index listing pursuant to 21 U.S.C. § 360ccc-1, and is not exempt from approval pursuant to 21 U.S.C. § 360b(j); and

      E.    21 U.S.C. § 331(k) by causing a new animal drug to become adulterated within the meaning of 21 U.S.C. § 351(a)(5), while such drug is held for sale after shipment in interstate commerce.

**JURISDICTION AND VENUE**

2.    This Court has jurisdiction over the subject matter and all parties to this action under 21 U.S.C. § 332(a) and 28 U.S.C. §§ 1331, 1337, and 1345.

3.    Venue in this District is proper under 28 U.S.C. § 1391(b) and (c).

**DEFENDANTS**

4. Defendant AMARC Enterprises, Inc. ("AMARC") is a corporation located at 1339 Broadway, El Cajon, California 92021 ("AMARC's Facility"), within the jurisdiction of this Court.

5. Defendant Albert Lee Sanchez, Jr., is the owner of AMARC and is its most responsible individual.  He oversees all functions of the business, including purchasing and distributing finished products, hiring and firing employees, and controls AMARC's websites and promotional materials.  Defendant Sanchez has the ultimate responsibility and authority to prevent, detect, and correct violations of the Act.  Defendant Sanchez performs his duties at AMARC's Facility, within the jurisdiction of this Court.

6. Defendant Gary L. Matson, Sr.'s title is Senior Consultant and Director of Practitioner Services at AMARC.  Defendant Matson is responsible for outreach to make claims for and induce sales of AMARC's products.  Through its undercover investigations, FDA has observed that Defendant Matson communicates directly with potential customers and advises them on the use of the company's products to treat, mitigate, or prevent diseases.  FDA has observed that Defendant Matson performs at least some of his duties in an office located at AMARC's Facility, within the jurisdiction of this Court.

7. AMARC distributes and sells two products under its own brand: Poly-MVA and Poly-MVA for Pets (collectively "Poly-MVA products").  AMARC also distributes and sells products branded by third parties.

8. Defendants' Poly-MVA products are manufactured by a contract manufacturer in New York and then shipped to AMARC's Facility in California for holding, sale, and distribution to customers.

9. The third-party brands that Defendants distribute are shipped by the products' manufacturers or distributors to AMARC's Facility in California for AMARC's holding, sale, and distribution to customers.

10. Defendants make claims for and sell their products online at www.polymva.com, and have additional web addresses that automatically link to www.polymva.com, including www.polymvaforpets.com. Defendants are responsible for the content, development, and design of their websites.

11. Defendants distribute their products to customers outside the state of California, including customers in Montana, Colorado, and Arizona.

## DEFENDANTS' VIOLATIONS OF THE ACT

### Defendants' Drugs

12. The introduction or delivery for introduction into interstate commerce of an unapproved new drug violates the Act. 21 U.S.C. § 331(d).

13. A product is a drug within the meaning of the Act if it is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals." 21 U.S.C. § 321(g)(1)(B).

14. Because a product's intended use determines whether it is a drug, a product that falls within the Act's dietary supplement definition, *see* 21 U.S.C. § 321(ff), may also meet the Act's drug definition if it is intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease. *See* 21 U.S.C. § 321(g)(1)(B).

15. The intended use of a product may be determined from any relevant circumstances surrounding the distribution of the product, including labeling. *See* 21 C.F.R. § 201.128.

16. The Act defines "label" as, *inter alia*, "a display of written, printed, or graphic matter upon the immediate container of any article," 21 U.S.C. § 321(k), and "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).

17. The Supreme Court has held that the term "accompanying" in the second clause of 21 U.S.C. § 321(m) is not restricted to labels that are on or in the article at issue and that physical attachment to the article is not necessary. *See Kordel v. United States*,

4

335 U.S. 345, 349–50 (1948).  Defendants' claims material constitutes labeling because it is part of an integrated distribution program.  *See id.* at 350.

18.     Defendants cause many of their products to be drugs within the meaning of the Act because they make claims in their labeling that establish that their products are intended for use in the cure, mitigation, treatment, or prevention of disease in man or other animals ("disease claims").

19.     FDA reviewed Defendants' websites and identified disease claims for Poly-MVA products, including, but not limited to, the following:

   A.     "Many people may take Poly-MVA . . . while undergoing medical treatments such as chemotherapy or radiation[.]"  (at https://polymva.com/wp-content/uploads/2020/04/Poly-MVA-Breakthrough-2020-Color-4-email.pdf);

   B.     "'Being a conventional Oncologist for over 30 years, enough was enough. There had to be a better way to help my patients. . . . When [I] began using and incorpo[ra]ting the various Poly-MVA protocols my entire practice changed and have seen amazing cases in my practice and in our Outcome based studies.'"  (at https://polymva.com/personal-journeys/doctors);

   C.     "'In February 2008, my doctor suggested a two month trial of Poly-MVA when he learned that I was sleeping 16 hours a day after 12 years of combating chronic lymphatic leukemia with the alpha-stim unit . . . . Within two months of using Poly-MVA, I started to wake up! . . . and change in blood count as shown . . . .'"  (at https://polymva.com/personal-journeys/doctors); and

   D.     "Poly-MVA for Pets can provide significant support for: . . . symptoms of cancer in dogs and cancer in cats (studies show best results in sarcomas in dogs, osteosarcomas in dogs, lymphoma in cats, leukemia in cats, and other tumors in cats)[.]"  (at https://polymva.com/product/poly-mva-for-pets/).

20.     The claims described in paragraph 19 above demonstrate that these products are drugs because they are intended to cure, mitigate, treat, or prevent diseases, including cancer.  *See* 21 U.S.C. § 321(g)(1)(B).

21. Defendants also intend for Poly-MVA to be administered intravenously, which excludes the product from the Act's dietary supplement definition. *See* 21 U.S.C. § 321(ff)(2)(A)(i); *see also United States v. Lane Labs-USA, Inc.*, 324 F. Supp. 2d 547, 569 (D.N.J. 2004) ("One requirement for a product to be considered a dietary supplement is that it must be 'ingested.'"), *aff'd*, 427 F.3d 219 (3d Cir. 2005).

    A. FDA reviewed Defendants' website, www.polymva.com, and identified a photograph relating to intravenous administration with a caption stating "IV Therapies 4 Day Training with Poly MVA. Taking multiple ones for the Team."

## Defendants' Human Drug is an Unapproved New Drug

22. A drug is a "new drug" if "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p)(1).

23. For a product to be deemed "generally recognized as safe and effective" ("GRAS/E") within the meaning of 21 U.S.C. § 321(p)(1), three conditions must be satisfied. First, there must be substantial evidence of its effectiveness. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 629–30 (1973). The Act defines "substantial evidence" as "evidence consisting of adequate and well-controlled investigations, including clinical investigations . . . on the basis of which it could fairly and responsibly be concluded by [qualified] experts that the drug will have the effect it purports or is represented to have . . . ." 21 U.S.C. § 355(d). Second, the investigations must be published in the scientific literature so that they are made generally available to the community of qualified experts and thereby subject to peer evaluation, criticism, and review. *See Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 652 (1973). Third, there must be a consensus among the experts, based on those published investigations, that the product is safe and effective under the conditions prescribed, recommended, or suggested in its labeling. *See generally id; Hynson*, 412 U.S. at 630–32.

24. Defendants' Poly-MVA lacks substantial evidence of safety and effectiveness. There are no published, adequate, and well-controlled investigations to show that this drug is GRAS/E for any use and, therefore, qualified experts cannot come to a consensus opinion concerning the effectiveness of this product.

25. Because Defendants' Poly-MVA is not GRAS/E, it is a new drug.

26. A drug that is a "new drug" within the meaning of the Act is prohibited from being introduced or delivered for introduction into interstate commerce unless FDA has approved a new drug application ("NDA") or an abbreviated new drug application ("ANDA") for that drug, or unless the drug is exempt from approval under an investigational new drug application ("IND"). *See* 21 U.S.C. § 355(a), (b), (i), and (j).

27. FDA searched its records and found no NDAs, ANDAs, or INDs for Defendants' new drug referenced in paragraph 25 above. Therefore, this product is an unapproved new drug within the meaning of the Act, 21 U.S.C. § 355(a).

28. Defendants violate 21 U.S.C. § 331(d) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce, new drugs within the meaning of 21 U.S.C. § 321(p) that are neither approved pursuant to 21 U.S.C. § 355(a), (b), or (j), nor exempt from approval pursuant to 21 U.S.C. § 355(i).

### **Defendants' Human Drug is Misbranded**

29. The introduction or delivery for introduction into interstate commerce of a drug that is misbranded violates the Act. 21 U.S.C. § 331(a).

30. Causing a drug to become misbranded within the meaning of 21 U.S.C. § 352(f)(1), while such drug is held for sale after shipment in interstate commerce, violates the Act. 21 U.S.C. § 331(k).

31. A drug is misbranded under 21 U.S.C. § 352(f)(1) if its labeling fails to bear "adequate directions for use" as defined by 21 C.F.R. § 201.5(a), and it does not fall within a regulatory exemption from that requirement. *See* 21 C.F.R. §§ 201.100–125,

201.129 (establishing exemptions from the adequate directions for use requirement in 21 U.S.C. § 352(f)(1)).

32. "Adequate directions for use" means "directions under which the layman can use a drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.5.

33. Any drug that is also a prescription drug cannot, by definition, have adequate instructions for lay use. 21 U.S.C. § 353(b)(1)(A) (requiring a drug to be dispensed by prescription that, "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug"). Because of the purposes for which it is intended, Defendants' Poly-MVA is a prescription drug. *See United States v. General Nutrition, Inc.*, 638 F. Supp. 556, 559–560 (W.D.N.Y. 1986) (discussing collateral measures related to intended use). Consequently, adequate directions under which a layman can safely use this product cannot be written.

34. Because Defendants' labeling for Poly-MVA does not bear adequate directions for use, those products are misbranded under 21 U.S.C. § 352(f)(1), unless they qualify for an exemption.

35. Defendants' Poly-MVA does not qualify for any applicable exemption from the requirement for adequate directions for use because it is neither approved nor the subject of an effective IND. *See* 21 C.F.R. §§ 201.100(c)(2), 201.115. Accordingly, Defendants' Poly-MVA is misbranded under 21 U.S.C. § 352(f)(1) because it lacks adequate directions for use.

36. Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction into interstate commerce drugs that are misbranded within the meaning of 21 U.S.C. § 352(f)(1).

37. Defendants violate 21 U.S.C. § 331(k) by causing Poly-MVA to become misbranded within the meaning of 21 U.S.C. § 352(f)(1), while such article is held for sale after shipment in interstate commerce.

**Defendants' Poly-MVA for Pets is an Adulterated New Animal Drug**

38. The introduction or delivery for introduction into interstate commerce of any drug that is adulterated violates the Act.  21 U.S.C. § 331(a).

39. Causing drugs to become adulterated while such articles are held for sale after shipment in interstate commerce violates the Act.  21 U.S.C. § 331(k).

40. Defendants cause Poly-MVA for Pets to be a drug within the meaning of 21 U.S.C. § 321(g) because Defendants make disease claims in the product's labeling, as described in paragraph 19.D above.

41. A drug is a "new animal drug" if it is a "drug intended for use for animals other than man . . . the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof."  21 U.S.C. § 321(v)(1).

42. Poly-MVA for Pets lacks substantial evidence of safety and effectiveness because there are no published, adequate, and well-controlled investigations to show that Poly-MVA for Pets is GRAS/E for any use and, therefore, qualified experts cannot come to a consensus opinion concerning its effectiveness.

43. Because Poly-MVA for Pets is an animal drug that is not GRAS/E, it is a new animal drug.

44. A new animal drug is unsafe within the meaning of 21 U.S.C. § 360b unless it is subject of an approved new animal drug application ("NADA") or an approved abbreviated new animal drug application ("ANADA") pursuant to 21 U.S.C. § 360b(b); a conditional approval pursuant to 21 U.S.C. § 360ccc; or a relevant index listing pursuant to 21 U.S.C. § 360ccc-1; or unless it meets the requirements for the investigational new animal drug ("INAD") exemption pursuant to 21 U.S.C. § 360b(j).  *See* 21 U.S.C. §§ 360b(a)(1), 360b(j).

45. Poly-MVA for Pets is not the subject of an NADA, an ANADA, a conditional approval, or an index listing; and Poly-MVA for Pets does not meet the requirements for an INAD exemption.

46. A new animal drug is adulterated under 21 U.S.C. § 351(a)(5), if it is unsafe within the meaning of 21 U.S.C. § 360b.

47. Accordingly, Poly-MVA for Pets is a new animal drug that is unsafe within the meaning of 21 U.S.C. § 360b and, therefore, adulterated within the meaning of 21 U.S.C. § 351(a)(5).

48. Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce, a new animal drug that is adulterated within the meaning of 21 U.S.C. § 351(a)(5) because it is unsafe in that it is not the subject of any FDA approval pursuant to 21 U.S.C. § 360b, a conditional approval pursuant to 21 U.S.C. § 360ccc, or relevant index listing pursuant to 21 U.S.C. § 360ccc-1, and is not exempt from approval pursuant to 21 U.S.C. § 360b(j).

49. Defendants violate 21 U.S.C. § 331(k) by causing Poly-MVA for Pets to become adulterated within the meaning of 21 U.S.C. § 351(a)(5), while such article is held for sale after shipment in interstate commerce.

## HISTORY

50. Defendants have previously violated the Act, as documented by FDA during reviews of Defendants' websites and undercover communications with AMARC representatives, including Defendant Matson.

51. In prior website reviews of www.polymva.com, FDA identified the same or similar disease claims for Defendants' Poly-MVA products as described in paragraph 19 above, including claims promoting Poly-MVA for use in treating cancer.

52. Furthermore, in an e-mail exchange in March 2018, Defendant Matson stated to an undercover FDA representative that "we have had some good responses to Poly-MVA for breast cancer."

53. Defendants also have a history of promoting Poly-MVA with claims for intravenous administration, which excludes the product from the Act's dietary supplement definition, as explained in paragraph 21 above.

    A. In prior website reviews of www.polymva.com, FDA identified claims that tout Poly-MVA for intravenous administration.

    B. In an e-mail exchange with an undercover FDA representative in March 2018, Defendant Matson recommended using Poly-MVA intravenously.

54. During earlier undercover e-mail communications in May and June 2017, respectively, FDA observed Defendant Matson making disease claims for Poly-MVA, including statements that "we have had good results with various types of lung cancers" and "[Poly-MVA] was developed to target cancer cells and repair damaged cells. I will send you a graphic that explains how it works."

55. Since 2012, FDA has warned Defendants about their violative disease claims, and they have made repeated promises to take corrective action. For example, at the close of an inspection at AMARC's Facility in December 2017, an FDA investigator reminded Defendant Sanchez that he could not make claims that Poly-MVA could treat, cure, or mitigate an ailment. Defendant Sanchez responded that he understood and intended to make changes to AMARC's website.

56. Previously, during an inspection at AMARC's Facility in March 2014, an FDA investigator informed Defendant Sanchez that disease claims on AMARC's website caused the company's products to be drugs.

57. By letter dated May 5, 2014, Defendant Sanchez responded to the FDA investigator's March 2014 discussion regarding disease claims, stating that AMARC had "reviewed the various marketing materials and websites for current information . . . [and] [i]t was brought to my attention that previously updated information on polymva.com and polymvaforpets.com was not done correctly . . . [a]ny links or incorrect information . . . have been removed and/or updated."

58.     After being notified by FDA in a letter dated January 21, 2015, that AMARC's corrective actions were deficient, Defendant Sanchez sent another letter to FDA, dated February 4, 2015, and again asserted that AMARC had corrected the claims and promised to "periodically review[] our site and literature to find opportunities for improvement."

59.     Previously, on December 11, 2012, FDA issued a Warning Letter to Defendant Sanchez regarding AMARC's marketing of Poly-MVA and Poly-MVA for Pets.  In the Warning Letter, FDA made clear that "claims in the literature and on [AMARC's] websites establish that [Poly-MVA] is a drug because it is intended for use in the cure, mitigation, treatment, or prevention of disease."  FDA provided over five pages of disease claims made by AMARC in Poly-MVA labeling and made clear that Poly-MVA for Pets was an unapproved new animal drug.

60.     By letter dated February 26, 2013, Defendant Sanchez responded to the Warning Letter and promised to "further review [AMARC's] materials and websites with guidance from [AMARC's] counsel and FDA compliance specialists."

61.     Despite a long series of promises, Defendants have failed to correct their violations, and continue to induce sales of their products with disease claims in the labeling.  Defendants' representations include claims that their products can be used to treat, cure, mitigate, or prevent cancer in humans or animals, which cause their products to be drugs within the meaning of the Act.  Based on their history of recurring violations, Defendants have demonstrated that they are unwilling or unable to take adequate steps to come into compliance with the Act.

62.     Based on the foregoing, Plaintiff believes that, unless restrained by this Court, Defendants will continue to violate the Act in the manner set forth above.

WHEREFORE, Plaintiff respectfully requests that the Court:

I.     Permanently restrain and enjoin, under 21 U.S.C. § 332(a), Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys,

successors, assigns, and any and all persons in active concert or participation with any of them, from directly or indirectly doing or causing to be done any of the following acts:

  A. Violating 21 U.S.C. § 331(d), by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce, new drugs within the meaning of 21 U.S.C. § 321(p) that are neither approved pursuant to 21 U.S.C. § 355(a), (b), or (j), nor exempt from approval pursuant to 21 U.S.C. § 355(i);

  B. Violating 21 U.S.C. § 331(a), by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce, drugs, as defined by 21 U.S.C. § 321(g)(1), that are misbranded within the meaning of 21 U.S.C. § 352(f)(1) because their labeling fails to bear adequate directions for use;

  C. Violating 21 U.S.C. § 331(k), by causing a drug to become misbranded within the meaning of 21 U.S.C. § 352(f)(1), while such drug is held for sale after shipment in interstate commerce;

  D. Violating 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce, a new animal drug, as defined by 21 U.S.C. § 321(v), that is adulterated within the meaning of 21 U.S.C. § 351(a)(5) because it is unsafe in that it is not the subject of any FDA approval pursuant to 21 U.S.C. § 360b, conditional approval pursuant to 21 U.S.C. § 360ccc, or relevant index listing pursuant to 21 U.S.C. § 360ccc-1, and is not exempt from approval pursuant to 21 U.S.C. § 360b(j); and

  E. Violating 21 U.S.C. § 331(k), by causing a new animal drug to become adulterated within the meaning of 21 U.S.C. § 351(a)(5), while such drug is held for sale after shipment in interstate commerce.

 II. Permanently restrain and enjoin, under 21 U.S.C. § 332(a), Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, assigns, and any and all persons in active concert or participation with any of

them, from introducing or delivering for introduction, or causing the introduction or delivery for introduction, into interstate commerce any drug, and/or Poly-MVA and Poly-MVA for Pets, and the same or similar products referred to by any other name or ingredient, unless and until:

   A. With respect to drugs intended for humans, the drug is the subject of an approved new drug application or abbreviated new drug application pursuant to 21 U.S.C. §§ 355(a), (b), or (j), or an investigational new drug application is in effect for such drug pursuant to 21 U.S.C. § 355(i); or

   B. With respect to drugs intended for use in animals other than man, the drug is the subject of an approved new animal drug application or abbreviated new animal drug application pursuant to 21 U.S.C. § 360b(b), a conditional approval pursuant to 21 U.S.C. § 360ccc, or an index listing pursuant to 21 U.S.C. § 360ccc-1, or an investigational new animal drug application is in effect for such drug pursuant to 21 U.S.C. § 360b(j); or

   C. Defendants have removed all claims from their product labels, labeling, promotional materials, websites, and social media platforms owned, operated, or controlled by Defendants that cause that product to be a drug as defined by the Act, and have ensured that their websites, social media platforms, and promotional and sales-inducing materials do not refer to or link to any third-party websites, social media platforms, or other materials that make claims about any of Defendants' products that cause any of the products to be a drug as defined by the Act;

  III. Order that FDA be authorized pursuant to this injunction to inspect Defendants' place(s) of business and all records relating to the receipt, manufacture, processing, packing, labeling, holding, and distribution of Defendants' products to ensure continuing compliance with the terms of the injunction, the costs of such inspections to be borne by Defendants at the rates prevailing at the time the inspections are accomplished; and

IV.  Order that Plaintiff be granted judgment for its costs herein, and that this Court grant such other and further relief as it deems just and proper.

DATED this 2nd day of December, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

GUSTAV W. EYLER
Director
Consumer Protection Branch

By:   s/ Shannon L. Pedersen
SHANNON L. PEDERSEN
Trial Attorney
Consumer Protection Branch
Department of Justice, Civil Division
Shannon.L.Pedersen@usdoj.gov

OF COUNSEL:

ROBERT P. CHARROW
General Counsel

STACY CLINE AMIN
Chief Counsel
Food and Drug Administration
Deputy General Counsel
Department of Health and Human Services

ANNAMARIE KEMPIC
Deputy Chief Counsel for Litigation

SETH I. HELLER
Associate Chief Counsel
Office of the Chief Counsel
Food and Drug Administration
10903 New Hampshire Avenue
Bldg. 31, Room 4538A
Silver Spring, MD 20993-0002
(240) 402-6502

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America

## DEFENDANTS
AMARC Enterprises, Inc; Albert Lee Sanchez, Jr.; Gary L. Matson, Sr.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  San Diego
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Shannon L. Pedersen, Trial Attorney, U.S. Department of Justice, P.O. Box 386, Washington, D.C. 20044  (202) 532-4490

Attorneys *(If Known)*
Reich, Frederick M.

'20CV2351 MMAAGS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[x] 1  U.S. Government Plaintiff
[ ] 2  U.S. Government Defendant
[ ] 3  Federal Question *(U.S. Government Not a Party)*
[ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 840 Trademark | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| | | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [x] 890 Other Statutory Actions |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | | |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

[x] 1 Original Proceeding
[ ] 2 Removed from State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from Another District *(specify)*
[ ] 6 Multidistrict Litigation - Transfer
[ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
21 U.S.C. § 332(a)

Brief description of cause:
Injunction proceedings

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** [ ] Yes  [x] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____
DOCKET NUMBER _____

DATE: 12/2/2020

SIGNATURE OF ATTORNEY OF RECORD
s/ Shannon L. Pedersen

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____